NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| In the Matter of | : | Case No. 11-11617/JHW |
| Tracy L. Purington | : | |
| Debtor | : | |

---

| | | |
|---|---|---|
| Filomena Boccella | | Adv. No. 11-1757 |
| | : | |
| Plaintiff | | |
| v. | : | **OPINION** |
| Tracy L. Purington | : | |
| Defendant | : | |

---

<div style="border:1px solid">

**FILED**

JAMES J. WALDRON, CLERK

May 29, 2012

U.S. BANKRUPTCY COURT
CAMDEN, NJ
BY:  s/ Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur

</div>

APPEARANCES[1]:  Filomena Boccella
5018 Moss Mill Road
Egg Harbor Township, New Jersey 08215
Plaintiff Pro Se

Tracy L. Purington
1043 Old Zion Road
Egg Harbor Township, New Jersey 08234
Defendant/Debtor Pro Se

The plaintiff, Filomena Boccella, brings this action against the debtor, Tracy Purington, alleging that the debtor committed fraud and theft by deception with respect to a contract to perform renovations on the plaintiff's home.  Although the original adversary cover sheet captioned the matter as an objection to the debtor's overall discharge under 11 U.S.C. § 727, the plaintiff's allegations and objections to the debtor's ability to discharge her claim are

---

[1]  Both parties appeared pro se.

more in line with a quest for nondischargeability of the debt alleged to be due

to the plaintiff under 11 U.S.C. § 523.  Because the element of intent to deceive

the plaintiff by the debtor has not been established on this record, the relief

sought by the plaintiff in this adversary complaint is denied.


## FACTS AND PROCEDURAL HISTORY


This action stems from a dispute over construction and renovation work

that the plaintiff, Filomena Boccella, hired the debtor, Tracy L. Purington, and

her company, Green Mountain Construction, to perform in 2009.  Ms. Boccella

sought to have her roof replaced, certain interior work performed, and a large

addition, approximately 22' x 21.5', added to her home.  She noticed the

debtor's advertisement in a local newspaper under the heading of "Additions,

Repairs & Remodeling."  The advertisement suggested that the name of the

debtor's construction company was "A-1 Jacking & Leveling",[2] and that the

company performed various types of construction work, including "sill plate,

sheet rock, renovs, painting, kits & baths, roofs, windows & siding."  Exh. P-

13.   The plaintiff responded to the ad and met with the debtor several times.

She was shown several albums of pictures of previous work done by the debtor,

as well as some references, but she did not contact any of the  references.   She

believed that the debtor was a licensed, insured, and fully functional

---

[2]  The debtor explained that A-1 Jacking and Leveling was not the business
name of her company, but that it actually meant that her company specialized
in, and had particular expertise with, jacking and leveling.

contractor.  At first, the plaintiff testified that the debtor assured her that "she

was registered and she was licensed and insured,"[3] but she later testified that

she did not recall asking the debtor whether she was registered or licensed

prior to starting the job.[4]

The debtor extended a proposal to the plaintiff in the name of Green

Mountain Construction d/b/a Tracy Purington to replace the roof, renovate the

plaintiff's kitchen and bathroom, sheetrock two existing bedrooms, and build a

new addition onto the home, for a total price of $45,000, which the plaintiff

accepted on May 21, 2009.  Work was to commence on the day after Memorial

Day and was to be completed by July 16, 2009.

The plaintiff tendered the initial down payment of $8,000, and the debtor

began work on the property.  The debtor applied for and obtained a permit from

the township to re-shingle the plaintiff's roof, listing the contractor as "4 Leaf

Clover", a company owned by the debtor's brother-in-law, Robert Hibbert.  The

company was not known to the plaintiff and had no other connection to the

job.  The application was signed by Hibbert, and contained his Contractor's

License Number and Federal Employee ID Number.  The debtor acknowledged

that her company, Green Mountain Construction, was not licensed in New

---

[3]  T30-22 to 23

[4]  T44-14 to 15

Jersey.[5]  She testified that she believed she could "pull" the roofing permit as a

subcontractor using her brother-in-law's name and license.  A second permit

for the addition to the home was applied for in the name of the owner,

Filomena Boccella.

Work on the project began on or about May 26, 2009.  The debtor

brought four workers to the project, two of whom were friends of her brother-

in-law and one was her "girlfriend's boyfriend", who she testified had been

doing construction work for twenty-five years.  The debtor relied on "word of

mouth" to bring these workers to the job.  The workers removed the old roof

and replaced damaged portions of the wood sheathing.  The roof was reshingled

but the workers did not complete all of the associated work for the reroofing.

In addition to the replacement of the roof, the workers took down the

sheet rock and insulation from the kitchen and two bedrooms, cleaned out and

removed the mold from these rooms, removed the tile from the kitchen and

bathroom, and began the excavation work necessary for the addition.

According to the plaintiff, many problems arose as the work progressed,

---

[5]  The debtor began operating the sole proprietorship known as Green
Mountain Construction in November 1996 in the State of Maine.  She testified
that the name was properly registered as a construction contractor in Maine,
but acknowledged that she did not register the company with the State of New
Jersey after moving to New Jersey in late 2008, even though she continued to
use the name as a sole proprietor.

including poor workmanship and lack of professionalism by the workers.  The problems described by the plaintiff included the following:

1.    The new roof was defective and incomplete.  During the job, it rained heavily, and the roof leaked in several places.  At one point, the foot of one of the workers working on the roof broke through to the bathroom ceiling.  As well, the wrong roof shingles were initially delivered to the plaintiff's home.  The parties agree that the shingles delivered were the wrong color, but the plaintiff also alleged that the shingles were the wrong style and manufacturer.  She testified that the debtor had "verbally" agreed to provide a higher quality textured shingle, but "then she pulled the bait-and-switch" and delivered a product by a different manufacturer.[6]  The shingles were sent back and replaced with shingles of the correct color, but still made by the same manufacturer.  It appears that the parties ultimately agreed to install the replacement shingles, with an adjustment in the contract price from $45,000 to $43,000.

2.    The excavation work for the addition was undertaken by a subcontractor, Totoro, Inc., hired by the debtor, whose principal

---

[6] T33-4 to 6.

was the debtor's husband's childhood friend.[7]  The work began

before a permit for the addition was issued by the Township.  The

plaintiff complains that the excavation work was extremely shallow

and substandard.  When the Township reviewed the proposed

plan, seventeen violations were found, including that the footings

needed to be deeper, the new foundation required a drain and the

crawl space required vents and a minimum depth.  According to

the debtor, the work was preliminary, and was intended only to rip

out the roots of plants and prepare the ground for more extensive

excavation.

3.    As part of the preparation for the addition, a hole was made into

the crawl space of the home to serve as the connector for the

addition.  The hole exposed a portion of the crawl space to the

elements, and mud invaded the interior of the space while the

interior was exposed.

4.    Different workers seemed to show up each day to work on the job,

and the workers rarely seemed to have the proper tools.  The

workers left the interior premises in a shambles, necessitating the

_____

[7]  The plaintiff complained that the defendant specifically told her that no
subcontractors would be used, although the "General Provisions" section of the
contract provided that the "Contractor may at its discretion engage
subcontractors to perform work hereunder, provided Contractor shall fully pay
said subcontractor and in all instances remain responsible for the proper
completion of this Contract."  ¶ 3.

plaintiff and her house-mate to engage in additional demolition

and clean-up activities.

Notwithstanding these problems, on June 1, 2009, pursuant to their

agreement, the plaintiff tendered to the debtor the next installment payment of

$9,000.  Thereafter, the relationship between the parties rapidly deteriorated.

A few days after the work commenced, the plaintiff left a message on the

debtor's answering machine, complaining to the debtor that the debtor and her

workers were "in over their heads, the workmanship is horrible, the roof still

leaks," and questioning when the project would be finished.[8]  The plaintiff

asked for some ($10,000) of her money back, but the debtor declined to cancel

the contract.  According to the debtor, when she returned to the plaintiff's

home on June 8 and again on June 11, 2009 to continue working on the

property, Kristen Distler, the plaintiff's house-mate, threatened her and her

employees with physical harm,[9] at which point the debtor left the job site.

Approximately a week later, on June 18, 2009, the debtor filed two

complaints against Kristen Distler with the Mullica Township Police

Department.  Counter-charges were later filed by Ms. Boccella, alleging that the

debtor had committed theft by deception by creating a false impression that

---

[8]  T45-17 to 19.

[9]  Exh. P-4; P-5.  With respect to the June 8, 2009 incident, Ms. Purington
stated that Ms. Distler threatened "to slit her and her workers throat and shoot
them if they did anything wrong."  Exh. P-4.

certain work could and would be performed.  The parties went to mediation.

Ultimately, both sides agreed to drop their respective charges and the matter

was dismissed.

On August 27, 2009, Ms. Boccella filed a civil complaint and order to

show cause against Tracy Purington, Dave Appleby, Robert A. Hibbert, Doe

Insurance Companies, Tom Doe of Totoro, Inc. and Tru Pro Industry in the New

Jersey Superior Court, Law Division, Atlantic County, case number L-3364-09.

With the consent of the parties, the state court referred the matter to

arbitration.  Both parties testified that they met with the two assigned

arbitrators separately, they were not sworn in, and they were not afforded an

opportunity to cross-examine witnesses.  Around the same time, on September

22, 2009, the debtor recorded a construction lien claim against the plaintiff's

residence in the amount of $26,000.

On November 3, 2010, the arbitrators reported in favor of Ms. Boccella,

granting her an award in the amount of $24,200, representing a full refund of

monies paid, plus $6,300 for the cost of repairing the roof and $900 for half the

cost of a dumpster used by the parties.  The debtor was directed to remove the

construction lien against Ms. Boccella's property.  On January 21, 2011, the

plaintiff moved for confirmation of the arbitration award.  On February 17,

2011, Judge Kane in the New Jersey Superior Court granted Ms. Boccella's

motion as to David Appleby and Green Mountain Construction, but denied her

motion to confirm the arbitration award as to Ms. Purington because of her

bankruptcy filing, which occurred on January 20, 2011.  On April 21, 2011,

the Superior Court ordered that the lien on Ms. Boccella's property be released.

In the debtor's bankruptcy filing, she scheduled Ms. Boccella as a

general unsecured creditor with a claim of $26,000 for breach of contract.  On

Schedule I, the debtor stated that she had been employed for the last two years

as a waitress for the Trump Taj Mahal Casino and that her husband was

unemployed and disabled.  The debtor reported that she had earned

approximately $3,500 in each of the last three years.[10]  The debtor also listed

her ownership interests in three businesses:  Green Mountain Construction

(1995-2008); Star Florist (1996-1997); and Appleby Development, Inc. (no

specified dates).[11]  The debtor's case proceeded as a no-asset case, and a

Report of No Distribution was filed by the Chapter 7 trustee.

On May 3, 2011, Ms. Boccella commenced this adversary proceeding pro

se against the debtor to "object/block the entry of the bankruptcy discharge,

due to the fact that the defendant committed consumer fraud and theft by

---

[10]  The debtor explained that she reported only approximately $3,500 as
income for 2009, despite receiving $17,000 from the plaintiff, because she
factored in her work expenses and determined that there was no net profit from
that job.

[11]  The debtor's disclosure in her Statement of Financial Affairs ("SOFA") that
her interest in Green Mountain Construction ended in 2008 obviously conflicts
with her 2009 contract with the plaintiff.  The debtor testified that the 2008
date was a clerical error on her petition that she missed.

9

deception." Adv. Complaint at 1. The plaintiff checked the box on the adversary cover sheet indicating that she was objecting to the debtor's discharge under 11 U.S.C. § 727(c),(d),(e). However, she did not cite to any of the applicable provisions under section 727(a), other than to assert that the debtor has failed to disclose certain income to the court in her petition. Instead, Ms. Boccella's complaint is focused on her belief that the debtor perpetrated a theft by deception and fraud upon her, raising allegations more in line with a claim of nondischargeability under 11 U.S.C. § 523(a)(2).

In her complaint, Ms. Boccella alleges that the debtor's actions violated the New Jersey Consumer Fraud Act, and that the debtor committed theft by deception and fraud. She claims that Ms. Purington placed an advertisement in the newspaper misrepresenting herself and/or her business as a licensed, registered, insured and competent home improvement contractor, even though her business was neither registered, licensed, insured, nor qualified to perform the type of work which she solicited.[12] The plaintiff further alleges that the debtor violated state regulations by not providing, in the signed contract, a notice informing the plaintiff of her right to cancel the contract within three

---

[12] The debtor testified that she was insured for this job. T21-14. In an unmarked exhibit, the debtor offered a copy of a sheet that purported to show that Green Mountain Construction was insured by the Ohio Casualty Group between September 21, 2008 and September 21, 2009. She did not renew the policy when it lapsed. At some point, Ms. Boccella filed a claim with Peerless Insurance as the insurer for Green Mountain Construction which was denied because the insurance policy had been canceled for nonpayment of premium, effective October 15, 2008. The debtor did not know who Peerless Insurance was. On this record, I am not able to determine whether insurance was in effect during the period of this contract.

days of signing.  In addition, the plaintiff claims that the debtor improperly

substituted inferior roofing shingles for the ones paid for by Ms. Boccella.

Lastly, the plaintiff contends that the debtor improperly filed for a permit on

the plaintiff's home under the debtor's brother-in-law's name.


In response, the debtor contends that she has already "been to court"

with respect to Ms. Boccella's claims of theft by deception and that such claims

were dismissed.  She insists that she did not commit consumer fraud and

asserts that she was forced to discontinue work on Ms. Boccella's home

because of the threats made against her.  She claims that the $17,000 paid by

the defendant represented compensation for work actually completed on the

project.  She further states that she did not switch the shingles that Ms.

Boccella expected would be used on the project for inferior shingles, but claims

that only the color of the original shingles was incorrect and that the shingles

were changed to the correct color.  When Ms. Boccella was still unhappy with

the replacement shingles, the contract price was reduced by $2,000 to

accommodate her.


On October 4, 2011, the day before trial, the plaintiff filed a two page

document captioned as an "Amendment to Adversary Proceeding Cover Sheet"

which sought to expand the allegations and causes of actions asserted by the plaintiff against the debtor.[13]

## **DISCUSSION**

Before we address the main issue raised in the plaintiff's complaint, we must consider two threshold matters.  First, we must determine what impact, if

---

[13]  The amended two page cover sheet listed ten separate allegations/causes of actions:

> 1) [11] U.S.C. § 727(c),(d),(e) object to discharge;
>
> 2) Violations of provisions set forth in 11 U.S.C. § 109(h) by Debtor;
>
> 3) [11] U.S.C. § 523(a)(2) Debtor uses false pretenses, makes false representation and commits actual fraud therefore creditor has ability to not have debt or claim of the Debtor discharged and have the bankruptcy petition dismissed/defeated;
>
> 4) To have creditor obtain a (declaratory judgment);
>
> 5) To have creditor recover money/property from Debtor;
>
> 6) To have Debtor be audited due to presumption of abuse under [11] U.S.C. 707(b);
>
> 7) To invoke the penalty for making false statements or concealing property under provisions set forth in 18 U.S.C. 152 and 3571;
>
> 8) To revoke the order of confirmation filed with the New Jersey Superior Court of Atlantic County on January 27, 2011 under docket number: ATL-L-3364 09 and to restore to active calendar all claims against Debtor Tracy L. Purington-Appleby;
>
> 9) 11 U.S.C. § 544 have trustee enter a complaint against Debtor to avoid transfer of property by Debtor; and
>
> 10) To have creditor obtain judgment by default.

any, the arbitration award has on our determination here.  Second, in light of

the plaintiff's last minute attempt to amend her adversary complaint, we must

clarify the cause of action actually before the court.


I.    Impact of Arbitration Award.


As noted, the plaintiff's civil action was initially referred to arbitration.

The plaintiff and the debtor/defendant both appeared before an assigned panel

of two arbitrators.  Both parties have testified that consideration of the matter

was brief.  The parties were not sworn in, and there was no opportunity for

cross-examination.  The arbitrators apparently met with each of the parties

separately.  In effect, there was no opportunity to test the information

presented by either party.  A copy of the "Report and Award of Arbitrators" was

presented to the court, but the report is conclusory, and the underlying record

was not presented.  The arbitrators' report identifies the matter simply as a

"claim by homeowner against contractor:  contractor not licensed; no proper

permits."[14]  With no further discussion or explanation, the arbitrators awarded

the plaintiff a full refund of the amount that she had paid ($17,000) plus an

additional $6,300 for the repair of the roof and $900 to cover half of the cost of

---

[14]  This statement is included in the section in which the arbitrators purport to
render "the following award(s) for the reasons set forth."  It is unclear if this
language was intended as a recital of the cause of action or an actual finding
by the panel.

the dumpster[15] used by the defendant.  There was no mention of either common law fraud or the New Jersey Consumer Fraud Act.  The arbitration award was confirmed by the Superior Court as to the other defendants, but not as to the debtor, because the automatic stay was triggered by the debtor's earlier bankruptcy filing.  If the arbitrators' award reflects a determination that the debtor was not properly licensed and that the proper permits were not obtained, we must determine whether the arbitrators' award in this case as against the debtor would have preclusive effect.

As a general matter, the preclusive effect of a state court judgment in federal court is determined by state law.  Lance v. Dennis, 546 U.S. 459, 466, 126 S. Ct. 1198, 1202, 163 L.Ed.2d 1059 (2006) ("Congress has directed federal courts to look principally to state law in deciding what effect to give state-court judgments.").  The Full Faith and Credit statute, 28 U.S.C. § 1738, provides in relevant part that the "records and judicial proceedings of any court of any such State . . .  shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken."  See, e.g., Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293, 125 S. Ct. 1517, 1527, 161 L.Ed.2d 454 (2005) ("The Full Faith and Credit Act, . . . requires the federal court to

---

[15]  According to the contract, the debtor was to pay for half of dumpster to be used in the construction.  Ms. Boccella asserted that she paid $1,258.35 for the dumpster and that she never received Ms. Purington's share.  It is unclear on this record why the arbiters' award of $900 would represent half of this amount.

14

'give the same preclusive effect to a state-court judgment as another court of that State would give.'"). In this instance, rather than a state court judgment or court judicial proceeding, we have only an unconfirmed arbitration award as against the debtor. "'Section 1738 does not by its terms apply to the findings of an arbitrator, and the Supreme Court has held that section 1738 preclusive effect need not be given to an unreviewed arbitration award.'" Walzer v. Muriel Siebert & Co., Civ. No. 04–5672, 2010 WL 3174458, *5 (D.N.J. Aug. 10, 2010) (quoting N.L.R.B. v. Yellow Freight Sys., Inc., 930 F.2d 316, 319 (3d Cir. 1991) (citing MacDonald v. City of West Branch, 466 U.S. 284, 288, 104 S. Ct. 1799, 1802 (1984) ("federal courts are not required by statute to give res judicata or collateral-estoppel effect to an unappealed arbitration award"))). See also 18B, Charles Alan Wright, et al., Federal Practice & Procedure, Jurisd. § 4475.1 n.6 (2d ed. 2002) ("Arbitral awards, unreviewed by any court, are not such judgments as are entitled to recognition under the full faith and credit statute."). "Any decision to accord preclusive effect thus must be a matter of a judicially fashioned preclusion rule. " 18B, Charles Alan Wright, et al., Federal Practice & Procedure, Jurisd. at § 4475.1 n.6. Cf. In re Kaplan, 143 F.3d 807, 815 (3d Cir. 1998) ("Generally applicable res judicata rules must sometimes be adapted to fit the arbitration context.").

In New Jersey, an arbitration award is not afforded the weight of a court judgment unless and until it is confirmed by the New Jersey Superior Court. See N.J.S.A. 2A:23A-18 ("Upon the granting of an order confirming, modifying

15

or correcting an [arbitration] award, a judgment or decree shall be entered by the court in conformity therewith and be enforced as any other judgment or decree."). See also Shtab v. Greate Bay Hotel and Casino, Inc., 173 F.Supp.2d 255, 261 (D.N.J. 2001) ("An arbitration award is not considered 'final' for purposes of issue preclusion absent judicial confirmation of the award, and, for this reason, unconfirmed arbitral awards have been denied preclusive effect in subsequent litigations"); Gruntal & Co., Inc. v. Steinberg, 854 F.Supp. 324, 337 (D.N.J. 1994) ("Absent judicial confirmation, an arbitration award will not result in a 'final judgment' and cannot, therefore, have preclusive effect on subsequent litigation."). But see Sheet Metal Workers Intern. Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc., 673 F.Supp.2d 313, 320 (D.N.J. 2009) ("Judicial proceedings ordinarily accord preclusive effect to arbitrations that have already adjudicated the same claims or defenses, even when the award is unconfirmed."); Nogue by Nogue v. Estate of Santiago, 224 N.J. Super. 383, 386-87, 540 A.2d 889, 891 (App. Div. 1988) (citing to the Restatement, Judgments, 2d §§ 83, 84).  There may be appropriate circumstances where an unreviewed or unconfirmed arbitration award may still be given res judicata or collateral estoppel effect.

In this case, however, it is clear that it would be inappropriate to give preclusive effect to the arbitration award entered in favor of the plaintiff and against the debtor.  First, both res judicata and collateral estoppel principles require, in effect, that the parties "have their day in court."  As to res judicata,

or claim preclusion, a plaintiff is precluded "from relitigating the same claim against the same parties, provided the claims have been 'fairly litigated and determined.'" <u>Carino v. Allstate Financial Servs., LLC</u>, 2011 WL 1364150, *3 (N.J. App. Div. Apr. 12, 2011) (quoting <u>First Union Nat'l Bank v. Penn Salem Marina, Inc.</u>, 190 N.J. 342, 352, 921 A.2d 417, 423 (2007)).  In a similar vein, application of collateral estoppel is premised upon a party having had a "full and fair opportunity to be heard." <u>Id</u>. at *4.  As noted above, both parties described their arbitration experience as very brief, with little if any opportunity to present evidence, cross examine witnesses, make legal arguments, or offer rebuttal.  There is no real indication that either party had their day in court. Many of the procedural elements typically present in a judicial proceeding were simply not present during this particular arbitration process.  <u>Cf</u>. <u>Nogue by Nogue v. Estate of Santiago</u>, 224 N.J. Super. 383, 387, 540 A.2d 889, 891 (App. Div. 1988) (considering whether the parties had a right "to present evidence and legal argument in support of the party's contentions and fair opportunity to rebut evidence and argument by opposing parties").

More significantly, the arbitration process did not resolve the issue of whether the debtor committed any act constituting "false pretenses, a false representation, or actual fraud," which would cause any debt due to the plaintiff from the debtor to be nondischargeable under 11 U.S.C. § 523(a)(2)(A). No preclusive effect may be applied to the unconfirmed arbitration award

entered against the debtor to resolve the plaintiff's nondischargeability

complaint.


II.    Impact of the Amended Complaint.


As previously noted, the cover sheet attached to the plaintiff's original

adversary complaint cited only to 11 U.S.C. § 727, yet the allegations raised in

the actual complaint were more in line with a nondischargeability action

pursuant to § 523.  On October 4, 2011, the day before the trial of this matter,

Ms. Boccella filed a two page document captioned as an "Amendment to

Adversary Proceeding Cover Sheet" seeking to expand the allegations and

causes of action asserted against the debtor.


Rule 7015, which makes Rule 15 of the Federal Rules of Civil Procedure

applicable in adversary proceedings, permits a party to amend a pleading with

the written consent of its adversary or with the approval of the court.

Fed.R.Bankr.P. 7015.  In the absence of written consent, the court retains

discretion to grant or deny a proposed amendment.  In re NorVergence, Inc.,

424 B.R. 663, 701 (Bankr. D.N.J. 2010).  If there is no evidence "'of any

apparent or declared reason-such as undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of

allowance of the amendment, futility of amendment, etc.'", Bivings v. Wakefield,

18

316 Fed.Appx. 177, 180 (3d Cir. 2009) (quoting Foman v. Davis, 371 U.S. 178,

182, 83 S. Ct. 227, 9 L.Ed.2d 222 (1962)), the bankruptcy court "should freely

give leave when justice so requires." Fed.R.Bankr.P. 7015.  See, e.g., Bivings v.

Wakefield, 316 Fed.Appx. 177, 180 (3d Cir. 2009) (granting request to amend

in the absence of undue delay, bad faith or futility); Belekis v. Burberry Ltd.,

No. Civ.A. 99–2964, 2001 WL 34047386 (D.N.J. Dec. 14, 2001) (allowing the

addition of another cause of action where there was no change in the damages

sought and no additional discovery was needed).  But see Parker v. F.D.I.C.,

447 Fed.Appx. 332, 337 (3d Cir. 2011) (denying leave to amend complaint on

eve of trial to add defendants); Galicia v. Country Coach, Inc., 324 Fed.Appx.

687, 689 (9th Cir. 2009) (denying leave to add a new claim on eve of trial as

prejudicial); Romero v. Drummond Co., 552 F.3d 1303, 1318-19 (11th Cir.

2008) (same).


The attempted amendment here, filed approximately five months after

the original complaint, on the day before trial, sought to expand the plaintiff's

complaint to include several newly asserted causes of action.  The first

amended cause of action, seeking to deny the debtor her discharge under 11

U.S.C. § 727(c,d,e), is consistent with the plaintiff's original adversary cover

sheet.  But as we noted at the outset, the plaintiff's factual allegations are

actually more in line with a nondischargeability action under § 523.   The third

amended cause of action remedies this inconsistency by expressly asserting a

new cause of action under 11 U.S.C. § 523(a)(2), which is consistent with the

actual arguments made by the plaintiff in this matter.  The plaintiff will be

permitted to amend her complaint to include this cause of action.  The other

alleged causes of action included in the plaintiff's last minute amendment raise

a host of new issues, including alleged credit counseling violations under §

109(h), a presumption of abuse under § 707(b), and an assertion that false

statements were made in violation of Title 18.  As well, the plaintiff seeks the

avoidance of transfers under § 544 and the reinstatement of the state court

proceedings against the debtor.

No justification has been offered to explain the undue delay in presenting

this lengthy list of last minute amendments.  Moreover, we have here only an

amendment of the cover sheet to the plaintiff's adversary complaint, listing the

proposed new causes of actions, with no factual foundation provided, either in

the pleading or at trial.  Allowing the plaintiff to amend her complaint in such a

manner, on the eve of trial, would unduly prejudice the debtor.  With the

exception of the § 523 nondischargeability cause of action, the plaintiff's

proposed amendments to the complaint are denied.

This determination leaves us with only one remaining cause of action

before the court:  whether the asserted debt due to the plaintiff from the

defendant, arising out of the construction contract between the parties, is

nondischargeable under 11 U.S.C. § 523(a)(2)(A).

III.    Nondischargeability Under 11 U.S.C. § 523(a)(2)(A).


The burden under 11 U.S.C. § 523(a)(2)(A) is on the plaintiff to prove her case by a preponderance of the evidence.  See Grogan v. Garner, 498 U.S. 279, 288, 111 S. Ct. 654, 660, 112 L.Ed.2d 755 (1991) ("Congress intended the ordinary preponderance standard to govern the applicability of all the discharge exceptions.");  In re Treadwell, 637 F.3d 855, 860 (8th Cir. 2011) (preponderance standard applies to § 523(a)(2)(A)); In re Hilley, 124 Fed. Appx. 81, 82 (3d Cir. 2005).  Section 523(a)(2)(A) protects debts obtained through fraud from discharge if the debt is "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by - (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."  11 U.S.C. § 523(a)(2)(A).


Section 523(a)(2)(A) conditions nondischargeability on the plaintiff's ability to establish that the debt in question was obtained as the result of the debtor's false pretenses, false representations or actual fraud.  The purpose behind this provision is "'to prevent a debtor from retaining the benefits of property obtained by fraudulent means and to ensure that the relief intended for honest debtors does not go to dishonest debtors.'"  In re Sabban, 600 F.3d 1219, 1222 (9th Cir. 2010) (citations omitted).  Section 523(a)(2)(A) was designed to cover those frauds which involve "moral turpitude or intentional

21

wrong"; "'fraud implied in law which may exist without imputation of bad faith

or immorality, is insufficient.'" In re Bailey, 34 Fed.Appx. 150, *1, 2002 WL

494325 (5th Cir. 2002) (quoting In re Allison, 560 F.2d 481, 483 (5th Cir. 1992));

In re Reath, 368 B.R. 415, 422 (Bankr. D.N.J. 2006).


Section 523(a)(2)(A) does not define the terms "false pretenses", "false

representation" or "actual fraud," nor does it expressly refer to the typical

common law fraud elements, such as the plaintiff's reliance, the materiality of

the misrepresentation or the debtor's intent.[16]  Nonetheless, in applying section

523(a)(2)(A), courts have routinely inferred that a plaintiff must establish

intent, reliance and materiality.  See, e.g., Field v. Mans, 516 U.S. 59, 68, 116

S. Ct. 437, 443, 133 L.Ed.2d 351 (1995) (courts have "routinely requir[ed]

intent, reliance, and materiality before applying § 523(a)(2)(A)"); In re Softcheck,

No. 08-23844(RTL), 2009 WL 4747527, *6 (Bankr. D.N.J. Dec. 4, 2009).

False pretenses, which "includes implied misrepresentations or any conduct

intended to create and foster a false impression," has been defined as:

> [A] series of events, activities or communications which, when
> considered collectively, create a false and misleading set of
> circumstances, or false and misleading understanding of a
> transaction, in which a creditor is wrongfully induced by the
> debtor to transfer property or extend credit to the debtor....
>
> A false pretense is usually, but not always, the product of multiple
> events, acts or representations undertaken by a debtor which

---

[16]  In contrast, section 523(a)(2)(B) specifically requires the debt to be incurred
through the use of a written statement:  (1) regarding the debtor's financial
condition; (2) that was materially false; (3) upon which the plaintiff had
reasonably relied; and (4) which the debtor made or published with the intent
to deceive the creditor.  In re Cohn, 54 F.3d 1108, 1114 (3d Cir. 1995).

purposely create a contrived and misleading understanding of a transaction that, in turn, wrongfully induces the creditor to extend credit to the debtor. A "false pretense" is established or fostered willfully, knowingly and by design; it is not the result of inadvertence.

In re Polaschek, No. 08–81311, 2012 WL 1569611, *5 (Bankr. C.D.Ill. May 3, 2012) (quoting In re Hanson, 432 B.R. 758, 771 (Bankr.N.D.Ill. 2010)).  See also In re Suarez, No. 08-15732, 2010 WL 1382110, *15 (Bankr. D.N.J. Apr. 5, 2010) (false pretenses or a false representation involves creating a "false impression" or making a "false or misleading statement about something").

Actual fraud "'consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another-- something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.'"  RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1293 (5th Cir. 1995) (quoting 4 Lawrence P. King, Collier on Bankruptcy ¶ 523.08[5] at 523-57 to -58 (15th Ed. Rev. 1994)).  See also McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000); In re Bashlow Realty Co. v. Zakai, No. 08-2040, 2010 WL 1529568, *7 n.1 (Bankr. D.N.J. Apr. 14, 2010) (identifying actual fraud as "more expansive than a mere misrepresentation").

To satisfy her burden under section 523(a)(2)(A), the plaintiff must therefore demonstrate that the debtor:

(a) obtained money, property or services;
(b) after falsely representing a material fact, opinion, intention or law;
(c) that the debtor knew at the time was false (or was made with reckless disregard for its truth);
(d) the debtor intended that the plaintiff rely on that statement;

23

(e) the plaintiff actually relied on the statement and the reliance was justified, and

(f) the plaintiff sustained damages as the proximate result of the false representation.

See In re Softcheck, No. 08-23844(RTL), 2009 WL 4747527, *6-7 (Bankr.

D.N.J. Dec. 4, 2009) (discussing the elements of § 523(a)(2)(A)).  There is no

question here that the debtor incurred a debt to the plaintiff.  The focus here is

whether the debtor entered into the contract with the plaintiff, and performed

the contract, with an intent to deceive the plaintiff.  The elements required to

be established to support a nondischargeability finding will be reviewed in

turn.

A.    Material Misrepresentation.

To establish nondischargeability under § 523(a)(2)(A), the plaintiff must

show that the debtor made a "material" misrepresentation of a fact, opinion,

intention or law.  In re Ingalls, No. 08-31908, 2010 WL 624089, *2-3 (Bankr.

D.N.J. Feb. 19, 2010).  See also In re Cohen, 191 B.R. 599, 604 (D.N.J. 1996),

aff'd, 106 F.3d 52 (3d Cir. 1997), aff'd, 523 U.S. 213, 118 S. Ct. 1212, 140 L.

Ed.2d 341 (1998); In re Dinter, No. 93-3823, 1993 WL 484201, *5 (D.N.J. Nov.

19, 1993), aff'd, 31 F.3d 1171 (3d Cir. 1994).  The false representation must be

sufficiently material to have caused the plaintiff to act where she would not

have done so had she known the truth.  In re Dunston, 146 B.R. 269, 275 (D.

24

Colo. 1992).  <u>See</u> <u>also</u> <u>Haxby v. National Boulevard Bank of Chicago</u>, 90 B.R.

340 (N.D. Ill. 1988); <u>In re Evans</u>, 181 B.R. 508, 515 (Bankr. S.D. Cal. 1995).


"In cases specifically involving contractor-debtors, there are usually two

ways to establish misrepresentation or fraud under section 523(a)(2)(A):  (1) to

show that the contractor executed the contract never intending to comply with

its terms, or (2) to demonstrate that the contractor intentionally

misrepresented a material fact or qualification when soliciting the work."  <u>In re</u>

<u>Wiszniewski</u>, No. 09–11102, 2010 WL 3488960, *5 (Bankr. N.D.Ill. Aug. 31,

2010).  A contractor's general representations regarding his expected work

performance and the actual quality of that workmanship do not qualify as

misrepresentations for purposes of section 523(a)(2)(A).  For example, in

<u>Wiszniewski</u>, the court determined that contractual language stating that the

work would be performed "in a professional manner according to standard

practices," and an oral representation that a higher quality floor would be

installed, qualified as "broken promises," but not misrepresentations.  The

court explained:

> Neither of these statements constitutes a misrepresentation under
> section 523(a)(2)(A).  As to the written provision in the contract,
> language in a sales agreement stating that a contractor will
> complete a construction project in a workmanlike manner
> according to specifications or industry standards does not amount
> to a misrepresentation just because the contractor breaks that
> promise.  Similarly, the Defendant's oral representation that "new"
> and "upgraded" subflooring would be needed—and his subsequent
> failure to install that subflooring—constituted a broken promise,
> not a misrepresentation.

> Although the Defendant's failure to install the new subflooring and
> generally complete the work according to standard practices may
> amount to a breach of contract, more than mere nonperformance
> is required to show a misrepresentation under section 523(a)(2)(A).

Id. at *6 (internal citations omitted).  In the absence of something more, poor

quality workmanship does not equate with a misrepresentation.  See, e.g., In re

Henderson, 423 B.R. 598, 622 (Bankr. N.D.N.Y. 2010) ("Substandard

performance or a mere breach of the construction contract do not rise to the

level of fraud necessary to except the debt from discharge."); In re Rodruck, No.

07–01872–LMJ7, 2010 WL 1740792 (Bankr. S.D.Iowa April 28, 2010); In re

Horton, 372 B.R. 349, 358 (Bankr. W.D.Ky. 2007) ("proof of the performance of

substandard work [cannot be equated] with proof of fraudulent intent.

Moreover, such a precedent could not feasibly exist without elevating nearly

every breach of contract action to a level of actionable fraud."); In re Barr, 194

B.R. 1009, 1019 (Bankr. N.D.Ill. 1996) (a "botched job", without more, is not

the same as a misrepresentation).

Here, we have more than poor quality workmanship.  In her

advertisement, and in her initial presentations to the plaintiff, the debtor

presented herself as an experienced, qualified and competent building

contractor.  While there may not have been specific discussion about the

registration and insurance status of the debtor's company, or about the

identity or experience of the workforce associated with the company, there is no

doubt that the debtor painted a picture of her company as an established

26

enterprise that was qualified to accomplish the work being solicited.  While the

debtor had construction experience, primarily in the State of Maine, she had

just returned to New Jersey permanently in November 2008, several months

before meeting with the plaintiff.  She had engaged in only one minor job,

which may have required painting basement walls.  She had no workforce in

place, and had not registered her company as a construction contractor in New

Jersey.  These facts combine to establish that the debtor materially

misrepresented herself and her company to the plaintiff.

 

       B.    <u>Knowledge That the Representation Was False</u>.

 

Another element required to be shown to establish a cause of action for

nondischargeability under § 523(a)(2)(A) is that at the time that the debtor

made the representations or omissions, she knew that those representations

were false, or that they were made with gross recklessness as to their truth.  <u>In

re Cohen</u>, 191 B.R. 599, 605 (D.N.J. 1996).

 

There is no question that at the time the debtor presented herself and

her company as a qualified, competent construction contractor, she knew that

her business enterprise was not properly registered, and she did not have a

particular workforce in place.  The debtor testified that when she contracted

with the plaintiff, she was engaging in the process of completing the necessary

paperwork to register her company.  She obviously understood the state

requirements in that regard, and chose to advertise her services and enter into

a contract before she met the threshold requirements.  I can conclude that the

debtor knew that her presentations to the plaintiff about her qualifications and

her established capacity to do the work were false.


    C.    Intent to Deceive.


    The primary focus of our attention in this case is whether the plaintiff

has established by a preponderance of the evidence that the debtor intended to

deceive her in presenting her qualifications and in contracting with her to

perform renovations and construction work on the plaintiff's residence.

The issue of intent requires actual or positive intent.  In re Carey, No. 08-

24396, 2010 WL 936117, *1 (D.N.J. Mar. 11, 2010).  "At the time of the

representation, [a debtor] must have intended by his representation to deceive

the plaintiff."  Id.  See also In re Chen, 227 B.R. 614, 626 (D.N.J. 1998) (stating

that "the intent to deceive under § 523(a)(2)(A) . . . requires proof of a higher

level of intent than the mens rea that must be found" under the state law

provision that prohibits the knowledgeable making of false statements to obtain

unemployment benefits); In re Nahas, 181 B.R. 930, 933 (Bankr. S.D. Ind.

1994); In re Young, 181 B.R. 555, 558 (Bankr. E.D. Okla. 1995); In re Woodall,

177 B.R. 517, 523 (Bankr. D. Md. 1995).  The intent to deceive may be inferred

from the surrounding facts and circumstances of the case.  In re Reynolds, 193

B.R. 195, 200 (D.N.J. 1996); In re Nahas, 181 B.R. at 933.  "The focus is . . . on

whether 'the debtor's actions "appear so inconsistent with [his] self-serving

statement of intent that the proof leads the court to disbelieve the debtor."' " In

re Reynolds, 193 B.R. 195, 200-01 (D.N.J. 1996) (quoting In re Horne, 823

F.2d 1285, 1287 (8th Cir. 1987)).  A showing of reckless indifference to the

truth of the representations coupled with the knowledge that it would induce

the action to be taken is also sufficient to satisfy an intent to deceive.  In re

Cohen, 185 B.R. 171, 177 (Bankr. D.N.J. 1994).  See also In re Phillips, 804

F.2d 930, 934 (6th Cir. 1986); In re Horst, 151 B.R. 563, 568 (Bankr. D. Kan.

1993).


Here, we have no evidence to suggest that the debtor entered into this

contract with the plaintiff, "never intending to comply with its terms."  While

the workmanship on the job was unsatisfactory, and the manner in which the

debtor obtained her workers for the project is highly problematic, the record

reflects that she attempted to proceed with the performance of the contract.

Materials were ordered, permits were obtained or applied for, workers were

engaged and demolition at the work site was commenced.  A new roof was

partially installed, albeit unsatisfactorily.  The degree of work commenced and

performed belies any unspoken intention not to perform in accordance with the

contract requirements.


I have found that the debtor knowingly misrepresented material aspects

of her business to the plaintiff.  Nevertheless, I am convinced by the debtor's

29

testimony that she believed that she and her workers, retained from familiar

sources, could perform the work contractually undertaken in a competent and

professional manner.  She had several years of construction experience in the

State of Maine.  She exerted some effort to satisfy the plaintiff regarding the

type of shingles to be used on the roof.  Accepting the plaintiff's version of facts

regarding the shingles, i.e., that the debtor promised to install a superior type

of shingle, but breached that promise by ordering an inferior type, the debtor

negotiated with the plaintiff, and got the plaintiff to accept a lower price on the

contract.  I am also convinced that if the relationship between the parties had

not broken down completely following the altercation between Ms. Distler and

the debtor, the debtor would have attempted to fix the problems on the job, and

to complete the job to the satisfaction of the plaintiff.  The likelihood is that she

would not have been successful in doing so, but that is not the issue.  The

issue is whether the debtor intended to deceive or defraud the plaintiff.

　　　To further support her contention that the debt due from the debtor to

her should be declared nondischargeable, the plaintiff asserts that the debtor

violated the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq. ("NJCFA"

of the "Act"), at least in so far as her failure to comply with certain regulatory

requirements imposed by the Act.  The plaintiff is correct to note that

regulatory violations were committed by the debtor, which may qualify as

violations of the NJCFA.  However, such violations do not supply the missing

element of intent to deceive necessary to declare the debt to the plaintiff
nondischargeable.

 

To the extent that a party is able to establish "(1) an unlawful practice,
(2) an 'ascertainable loss,' and (3) 'a causal relationship between the unlawful
conduct and the ascertainable loss,'" under the Act, it may recover damages,
treble damages and reasonable attorneys' fees.  Cox v. Sears Roebuck & Co.,
138 N.J. 2, 15, 647 A.2d 454, 461 (1994).  See also Ulokameje v. Content, 2012
WL 75136, *6 (N.J. App. Div. Jan. 11, 2012).  A regulatory violation of the
Contractors' Registration Act, N.J.S.A. 56:8-136 et seq. ("CRA"), which was
enacted in 2004 as an addendum to the New Jersey Consumer Fraud Act.
Murnane v. Finch Landscaping, LLC, 420 N.J. Super. 331, 336, 21 A.3d 637,
460 (App. Div. 2011), is considered to be an unlawful act under the CFA.
N.J.S.A. 56:8-146(a) ("It is an unlawful practice and a violation of [the CFA] to
violate any provision of this act.").  See also Napolitano v. Haven Homes Inc.,
No. 10–1712, 2012 WL 253175, *9 (D.N.J. Jan. 26, 2012) ("any violation of the
Contractor's Registration Act is a per se violation of the CFA").  Under the CRA,
all home improvement contractors must be both registered and insured.  The
Act expressly states that "no person shall offer to perform, or engage, or
attempt to engage in the business of making or selling home improvements"
unless they are first registered with the state.  N.J.S.A. 56:8-138(a).  In
addition, the Act requires annual registration for all home improvement
contractors, N.J.S.A. 56:8-138(b), defined under the Act to include any "person

engaged in the business of making or selling home improvements."[17]  N.J.S.A.

56:8-137.  Each contractor is required to "prominently display their

registration numbers . . . in all advertisements distributed within this State, on

business documents, contracts and correspondence with consumers of home

improvement services in this State, and on all commercial vehicles" used by the

contractor.  N.J.S.A. 56:8-144(a).  The registration requirement is strictly

applied.  Municipalities are not permitted under state law to issue a permit to

any contractor who is not registered under the CRA.  N.J.S.A. 56:8-147(b).


The debtor has acknowledged that she failed to register with the State

after she returned to New Jersey and commenced advertising and working as a

home improvement contractor.  At the time that she entered into the home

improvement contract with the plaintiff, she was not registered.  Therefore, she

could not and did not properly display her registration number in her

advertisements and on her vehicles, as required by state law.  These failures

constitute a violation of the CRA, and qualify as an unlawful practice under the

Consumer Fraud Act.


As well, it can be readily determined that the debtor's contract violates

the CRA in other ways.  The CRA requires all home improvement contracts in

excess of $500 to include certain provisions, such as:

---

[17]  "Home improvements" are specifically defined to include any work involving
"remodeling, altering, renovating, repairing, restoring, modernizing, moving,
demolishing, or otherwise improving or modifying of the whole or any part of
any residential or non-commercial property."  N.J.S.A. 56:8-137.

(1) The legal name, business address, and registration number of the contractor;

(2) A copy of the certificate of commercial general liability insurance required of a contractor pursuant to section 7 of this act and the telephone number of the insurance company issuing the certificate; and

(3) The total price or other consideration to be paid by the owner, including the finance charges.

N.J.S.A. 56:8-151(a).  The contract must include a "conspicuous notice printed in at least 10-point bold-faced type" that notifies the consumer of their ability to cancel the contract at any time before midnight of the third business day after receiving a copy of the contract.  N.J.S.A. 56:8-151(b).

It is not disputed that the registration number, a copy of the insurance certificate and the insurer's telephone number were not included in the contract between the parties.  Nor is there no evidence that the 3-day review provision was "conspicuously" included in the contract.  Each of these omissions also constitutes a violation of the CRA, which qualifies as an unlawful practice under the NJCFA.

While the other elements of a successful cause of action under the NJCFA might be established, i.e., an ascertainable loss and a casual connection between the unlawful conduct and the ascertainable loss,[18] the

---

[18]   A question is presented as to whether the plaintiff's ascertainable losses were occasioned as a result of the debtor's regulatory violations.  <u>Bosland v. Warnock Dodge, Inc.</u>, 197 N.J. 543, 560, 964 A.2d 741, 751 (2009) ("a plaintiff

primary missing element, for purposes of a nondischargeability complaint

under § 523(a)(2)(A), is the element of intent to deceive.  Regulatory violations

which constitute unlawful practices under NJCFA are subject to a standard of

strict liability, and intent is not an element.  Allen v. V and A Bros., Inc., 208

N.J. 114, 133, 26 A.3d 430, 442 (2011); Bosland v. Warnock Dodge, Inc., 197

N.J. 543, 556, 964 A.2d 741, 748-49 (2009); Cox v. Sears Roebuck & Co., 138

N.J. 2, 18, 647 A.2d 454, 462 (1994); Ulokameje v. Content, 2012 WL 75136,

*6 (N.J. App. Div. Jan. 11, 2012).  Therefore, the fact that the debtor violated

the NJCFA does not entitle the plaintiff to a claim under the Act that is

nondischargeable through the debtor's bankruptcy case.


    In light of my conclusion that the critical element of intent to deceive has

not been established against the debtor by a preponderance of the evidence in

this case, I need not review the other aspects required to be shown to establish

---

who cannot prove the causal link between the asserted regulatory violation and
his loss cannot find relief within the CFA"). The damages asserted by the
plaintiff appear to be contractual in nature, relating to the debtor's poor
workmanship and failure to complete the contracted job.  There may not to be
a causal connection between the regulatory violations and the plaintiff's actual
damages. See, e.g., Kort v. Van Aswegen, 2011 WL 5137833, *1 (N.J. App. Div.
Nov. 1, 2011).  (The regulatory violations committed by the contractor were not
the cause of the plaintiffs' losses.).  See also Czmyr v. Avalanche Heating and
Air Conditioning, Inc., 2011 WL 519871 (N.J. App. Div. Feb. 16, 2011)
(concluding that the plaintiff did not suffer an ascertainable loss attributable to
the CRA/CFA violations); Dream Builders v. Estate of Paton, 2010 WL 1924776
(N.J. App. Div. May 14, 2010) (the defendant did not suffer a loss as a result of
the contractor's violation of regulations requiring it to include its registration
number and the insurer's telephone number in the contract and to reduce all
change orders to writing).

nondischargeability, including justifiable reliance by the plaintiff, and damages proximately resulting from the false representations

I am certainly sympathetic to the serious hardships endured by the plaintiff and her house-mate as a result of the failure of this project occasioned by the actions and inactions of the debtor, and recognize that the debtor clearly incurred a debt to the plaintiff as a matter of breach of contract.  However I cannot conclude that all of the elements required to be shown to establish nondischargeability under section 523(a)(2)(A) have been met on this record.

## CONCLUSION

The plaintiff's request to declare the debt due to her from the debtor as nondischargeable under 11 U.S.C. § 523(a)(2)(A) is denied.  The complaint shall be dismissed with prejudice.

An order has been entered herewith.

Dated:  May 29, 2012

_____
JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT